MARK J. MOLZ, ESQUIRE
1400 RTE. 38 EAST, PO BOX 577
HAINESPORT, NJ 08036
Attorney ID # 038271985
Telephone 609-267-8884
Facsimile 609-267-1281
Attorney for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MAUREEN MOLZ | : | Civil Action No. |
| | : | |
| Plaintiff(s) | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| FEDERAL AVIATION | : | COMPLAINT WITH JURY DEMAND |
| ASSOCIATION; | : | AND DISCOVERY REQUESTS |
| SHELLEY YAK; JAIME | : | |
| FIGUEROA; John Doe 1- | : | |
| 10 individually, jointly and | : | |
| severally | : | |
| | : | |
| | : | |
| Defendant(s) | : | |

Plaintiff Maureen Molz residing at by way of Complaint states:

### PARTIES AND JURISDICTION

1. At all relevant times the Defendant Federal Aviation Administration maintains offices at the William J. Hughes Technical Center, Atlantic City International Airport, Atlantic City, Atlantic County, New Jersey.

1

2. At all relevant times the Defendant Shelley Yak was an adult individual employed by the Federal Aviation Administration at the William J. Hughes Technical Center, Atlantic City International Airport, Atlantic City, Atlantic County, New Jersey.

3. At all relevant times the Defendant Jaime Figueroa was an adult individual employed by the Federal Aviation Administration at the William J. Hughes Technical Center, Atlantic City International Airport, Atlantic City, Atlantic County, New Jersey.

4. John Doe 1-10 is a fictitious designation for an individual or business entity or agent servant, or assign thereof whose act or omission contributed to the damages sustained by the plaintiff as set forth more fully herein.

5. The principal is responsible for the acts or omissions if his/her/its agent servant or assigns.

6. Jurisdiction arises under 28 U.S.C. § 1346.

7. Venue lies in the District of New Jersey in that the events which gave rise to this claim occurred in this district.

## COUNT I

8. The foregoing responses are repeated at length as though set forth herein.

9. On February 5, 2017, the Plaintiff was promoted to the position of Supervisor, Aviation Technical Systems Specialist, FV-2186, for Research and Development Management Division, ANG-E4.

10. Plaintiff's first line supervisor was Jaime Figueroa, Deputy Director of the William J. Hughes Technical Center (WJHTC) and her second line supervisor was Shelley

Yak, Director of the WJHTC, who also referred to herself as the Research Director for the FAA.

11. The Plaintiff was a member of the Directors Senior Management Team (SMT).

12. The Plaintiff was discriminated against because of her age, sex and sexual orientation.

13. Plaintiff endured a toxic and hostile work environment.

14. In her over 32-year career in federal service, the Plaintiff has worked in highly sophisticated environments and for challenging military and civilian leaders, but she had never seen or experienced anything like the environment that existed with the FAA's WJHTC leadership team.

15. Mr. Figueroa was the permanent ANG-E4 division manager until his promotion to the position of Deputy Director for the WJHTC, when Mr. Mike Greco assumed the acting Division manager position.

16. The acting manager tried to transition the work to the Plaintiff, but he had little knowledge of the yearly cycle of work products that faced the division staff because he only experienced 3 months of the 12-month cycle of work in the division, while management recruited for the permanent position.

17. Upon acceptance of the offer for this job, the Plaintiff was asked to start work before the effective date and was given little to no background as to the initiatives on-going (i.e. NARP redesign).  The Plaintiff effectively had to figure out what was going on her own because very little was explained to her by her managers.

18. Additionally, early on, the Plaintiff learned that Mr. Figueroa, who had the most experience with the job, had been asked to back out and he was not involved for over a year.

19. The position, even thought it was at the division level (normally second line supervisor), was also first line supervisor for all the division employees which created an impossible situation.

20. The demands of handling first line responsibilities and senior management responsibilities while learning the highly visible mission of the division during a time of change and amid the climate of micro management was challenging.

21. The Plaintiff, almost immediately, recognized that the division was dysfunctional and lacked the personnel and expertise required to meet its newly emerging mission requirements, as the Director instituted change through new initiatives that required improved skill sets greater than had previously been required.

22.  It quickly became clear that Mr. Figueroa had been doing much of the work himself, since, during his tenure in the job, the work was still mostly routine and uncomplicated.

23. Before the Plaintiff's arrival, the SMT had agreed that 2 branch managers were necessary for the division to function properly, but had not formalized these positions.  Quickly, it became clear to the Plaintiff that she needed more help. Being judicious with resources, the Plaintiff tried to limit the need for a branch manager to one, but eventually things were so busy that she asked for and received another.

24. The Plaintiff was having knee problems and trying to resolve them when she entered the job.  To her dismay she was constantly being called to the Director Yak's office to discuss various work-related issues.

25. The Plaintiff's office was in bldg. 316, at the farthest end and Director Yak's office, was the farthest end of bldg. 300 very far away from each other.  Every step to the Director's office was physically painful to Plaintiff.

26. No other managers were asked to report to Director Yak's office with the frequency that the Plaintiff was, nor were their responsibilities so meticulously micro-managed as was the Plaintiff's.

27. In the summer of 2017, while on travel to Washington DC, the Plaintiff while carrying a heavy backpack fell, tripping on a curb outside the Building 10A (the FAA Headquarters building).  Her head hit a concrete wall, and she scraped her face on the wall as she fell to the ground.  Her face was bleeding.  She did not report the incident formally, but did notify Deputy Figueroa of the fall a few days later, during a meeting with him and he did not seem concerned and took no action to report it, which was against policy.

28. In January of 2018, the Plaintiff received a rating of 2 out of a possible 4 in the valuing performance system.  This was low after working extremely hard that first year, even starting before her start date.

29. It is typical of FAA managers to rate new employees lower if they did not work for them for most of the year, right or wrong.   The rating period had ended at the end of September 2017, she was in the position for 7 months' time.      Though

disappointed, the Plaintiff accepted this, not knowing it would foreshadow the behaviors to come.

30. In January of 2018, the Plaintiff also switched from a backpack to a roller bag and soft sole shoes, to take pressure off her knees.

31. In March of 2018, she finally decided on a series of medication shots for her knees, which wear off over time, but that ultimately improved her knees and reduced her pain by about 75%. She continued to use the roller bag and soft shoes until her retirement.

32. Administration of the Research, Engineering and Development Advisory Committee (REDAC) was a part of the Plaintiff's division's functions. In April of 2018, Director Yak decided, without any consultation with the Plaintiff, to transmit via letter, a document that was marked "For Official Use Only" (FOUO).

33. On April 18, 2018, unbeknownst to the Plaintiff, the Plaintiff's initials were forged on a concurrence grid of the transmittal letter.

34. The letter from Director Yak was dated 16 April 2018. In December 2018, eight months later, the Plaintiff received a copy the forged concurrence grid and this scared her as she had begun to realize there was something really wrong happening in the Director's office with no boundaries to its power and influence.

35. The Plaintiff mentioned the release of the FOUO document to Deputy Figueroa in a meeting shortly after it happened. Deputy Figueroa shrugged it off.

36. REDAC is congressionally mandated Advisory Committee populated with appropriate industry and academic experts in aviation, most of which are not federal

employees and the information shared with this committee is effectively in the open, meaning no longer in the control of the FAA or the government.

37. The meetings are open to the public and the records are publicly available upon request.

38. There was a lot of pressure from Director Yak to get the FOUO document to REDAC. The Plaintiff ended up at Beth Burkett's desk because Ms. Burkett was persistently asking the Plaintiff to concur with the release of the FOUO document. It was becoming clear to the Plaintiff that, no one says "No" to Director Yak.

39. Under such relentless pressure, the Plaintiff initialed the grid, but put next to her initials, "with reservation". The Plaintiff was out of the office the next day or two.

40. The Plaintiff had not seen that concurrence grid sheet again.

41. During her absence, there was a new push to release the letter, and a "new concurrence sheet" was apparently generated, which included the Plaintiff's forged initials.

42. The Plaintiffs understanding is, that the letter was hand delivered to the REDAC Chair, Dr. John Hansman by Beth Burkett, while he was visiting the WJHTC that week.

43. Once it was delivered, Director Yak asked the Plaintiff's employee, Chinita Roundtree-Coleman to distribute the document out to the REDAC sub-committees via email.

44. The Plaintiff was concerned about the motivation behind this, so the Plaintiff intervened and sought WJHTC legal counsel advise.

45. Initially, when the Plaintiff met with the WJHTC legal office, Diane Cherinchak-Loughrin and Lisa Rodes, they both agreed it did not make sense to release the FOUO document and that if the office who produced it wanted it released, they could remove the marking.

46. Strangely, WJHTC Legal office changed its position after speaking to Director Yak and told the Plaintiff to; "trust" Director Yak.  After the Plaintiff asked for legal opinion again, Director Yak asserted to the Plaintiff that she had agreement from AGC, FAA General Counsel, that it was OK to release to the REDAC.

47. The Plaintiff asked Director Yak for a name in AGC or for concurrence in writing. The Plaintiff received nothing in writing from legal or a point of contact with direct knowledge, only Director Yak's word.  In a follow-up email exchange, the Plaintiff wrote back to Dianne, "trust but verify" after she told the Plaintiff to speak to Director Yak.

48. Even more egregiously, in August of 2018, Director Yak approved in email the release of the document beyond REDAC membership to a private citizen with no official affiliation with REDAC.

49. That summer, of 2018, the Plaintiff received a substantial performance award.

50. On October 4, 2018, the second branch manager, Ken Diaz starts work in ANG-E4 as the ANG-E41, more than 1.5 years after the Plaintiff became the division manager.

51. The work load of the division continually increased with the stacking of core work, and added tasks from OST, the NextGen Associate Administrator (ANG-1) and Director Yak.

52. The lack of strategic direction by the directors was startling and the continuous micro-management of the division R&D products was untenable.  The Plaintiff increasingly felt alienated, bullied, and dismissed.

53. The Plaintiff had tried to shield her employees from the erratic behavior and the constant confusion, but she started to suffer from its effects.

54. Physical symptoms began to appear.  The Plaintiff had been going to Director Yak's office for specific detailed discussions on the various products of the division multiple times a week for over a year.  It is hard to imagine that the Plaintiff's peers suffered such scrutiny, and she began to wonder why she was being treated differently from her peers.

55. The Plaintiff had an extremely difficult conversation with Director Yak on October 16, 2018 while teleworking.   Director Yak's constant micro-managing had taken its toll.  The Plaintiff just got the workload in ANG-E4 set up so it was survivable and Director Yak introduced the "Landscape" task.

56. The Plaintiff asked if she could do this herself without the constant micro-management from Director Yak and that she would be happy to brief the Director on progress regularly.

57. Director Yak refused and said she wanted to be involved with every bi-weekly meeting with the team.  The Plaintiff accepted her direction and Director Yak drove the landscape effort in a direction that yielded a weak and disappointing product.

58. Within one week of these events, both Deputy Figueroa and Mr. Greco asked the Plaintiff about "succession planning" the Plaintiff's position, which is code for

Plaintiff's termination. This served to confirm for the Plaintiff that she was being pushed to step aside and that it was being discussed with her peers.

59. On Thursday November 1st, 2018 many tasks commanded the Plaintiff's attentions, but the SMT (Director Yak and her staff) were in another all-day offsite meeting.

60. Plaintiff and other employees received a briefing from an E4 retiring employee about the Technical Center library. Director Yak tasked the Plaintiff to produce more information on the subject within a tight time frame.

61. Director Yak was pushing the Plaintiff hard for no apparent reason despite her already significant work load and no available staff to delegate to.

62. When Plaintiff reported this she saw Director Yak smirk at her.

63. The Plaintiff felt minimized, disrespected and bullied.

64. The Plaintiff was badly shaken. The Director called a break after tasking the library task to Jim Connett, who eventually took over the library function and still had done nothing to get it to function until the Plaintiff's retirement.

65. The Plaintiff went outside to compose. When the Plaintiff composed herself, she returned to the room and Deputy Figueroa sat down next to her.

66. He said that she needed to "take a breath".

67. Deputy Figueroa then immediately began speaking to her about one of the tasks she needed to work on.

68. No one in the room asked aloud if the Plaintiff was ok. Sheila Smallwood mouthed to the Plaintiff, "are you OK?" in less than a whisper. The Plaintiff said out loud, "no".

69. Paula Nouragas whispered to the Plaintiff, "we have your back".

70. The Plaintiff said, "you have no idea what has been happening."

71. No one else even spoke to the Plaintiff after that.  The scary part was the lack of outward concern for the Plaintiff.  It was clear to the Plaintiff that she had been effectively alienated from her peers and believes her peers were all afraid to show any outward sympathy because it might anger Director Yak.

72. Deputy Figueroa called the Plaintiff at home later that same evening asking if she was ok saying he was "worried about her".

73. In the conversation Deputy Figueroa said, before hanging up "please don't slit your wrists".

74. The Plaintiff said she would not, but was deeply saddened that her career had come to this miserable place under these two abusive managers, Defendants Yak and Firgueroa.

75. The Plaintiff received her rating in Nov 2018, that had been generated in the summer before things turned so bad.  It was a 3 of 4.

76. In early-mid December 2018, the Plaintiff received Trump related a partisan text from Deputy Figueroa.

77. The Plaintiff did not respond.

78. In December of 2018, the Plaintiff received 2 more texts from Deputy Figueroa featuring embarrassing pictures of President Trump.  This is a Hatch Act violation.  Punishment ensues.

79.  Deputy Figueroa sends messages on both his personal and work phones, and the Plaintiff never knew which phone was which, because both of his numbers were in her work phone.  This is a violation of the Hatch Act.

80. On December 19th, the Plaintiff had a quarterly how-goes-it (HGI) meeting with Director Yak.

81. The Plaintiff took her 2 branch managers with her in case Director Yak wants to discuss specific work and because she was now afraid to meet with the Director alone after what happened at the offsite.  Director Yak asked the branch managers to leave early.

82. When alone, Director Yak said, "we have an "unhealthy relationship"" and the Plaintiff agreed.   Director Yak kept asking the Plaintiff "what do you want to do?" The Plaintiff assumed this was another attempt by Director Yak to get her to say she wanted to get out of her position.

83. Director Yak asked the Plaintiff if she is holding her, the Director, accountable for what is happening with the ANG leadership and the Office of the Secretary of Transportation?

84. In the same meeting, for no reason Director Yak said to the Plaintiff "I have never discussed your performance with anyone".  The Plaintiff has no idea why Director Yak said this, but it makes the Plaintiff think Director Yak has and she is trying to create a record, or see if the Plaintiff knows if she has.

85. The Plaintiff told Director Yak "you have broken me".  Both Director Yak and Deputy Figueroa continued to go around the Plaintiff directly to her managers, sometimes their staff and unbelievably, directly to the contractors with questions and tasks, leaving the Plaintiff  unable to control work in her division and leaving the Plaintiff with eroded authority and lacking knowledge of the work being discussed, though still being held accountable.

86. The Plaintiff never saw any other manager being treated with such disrespect and blatant unfairness.

87. In a SMT meeting, Director Yak uses a term introduced by Dr. Eric Niederman, the Plaintiff's peer, regarding "Big heads and Egg heads".

88. Supposedly by his definition, "Big Heads" are the really smart people, like scientists and engineers, Egg heads are not.

89. In the open discussion, in front of everyone, Director Yak insulted the Plaintiff by saying the Plaintiff should attend a specific meeting and when Eric offered some technical folks she said, "No" we don't need "Big heads" implying the Plaintiff is an "egg head" and not a smart technical professional.

90. The Plaintiff was affected and embarrassed.  This is just one example of the intentional discourteous, rude, and openly disrespectful behavior suffered by the Plaintiff from Director Yak.

91. No one else, to Plaintiff's knowledge suffered such unprofessional treatment.  This is also an example of the micro aggression the Plaintiff was being systematically subjected to by Director Yak.

92. Director Yak began holding SMT special meetings, "norm 2s", on Mondays when all knew the Plaintiff was not in the office.

93. This sent a message to the Plaintiff that her input is not only not valuable, but that she is being alienated/marginalized.

94. During the 2019 government shutdown, Director Yak was an "excepted employee", which means she is in work only for safety, "life and limb" reasons.  The Plaintiff

was a RED funded employee who was allowed to work, because there were prior year funds to cover her salary.

95. Director Yak was not supposed to be working on actual work, but in fact she was, and continued to do so throughout the shutdown.  Director Yak's focus was on "Landscapes".

96. Defendant Yak acts as though she is above the rules and not accountable for her actions.  Director Yak laughs about it often during that time, all the while micro-managing the Landscape effort in the Plaintiff's division.

97. In a meeting during the shutdown on January 17th, 2019 Director Yak compared the pain of going through Superstorm Sandy to the pain of going through the shutdown.  Director Yak knows the Plaintiff lost her home in Superstorm Sandy.

98. Director Yak says a man-made tragedy is worse than a natural disaster.  It was the most bizarre comment, but it was like most of the Director's comments and behavior demonstrating a problem with her tolerance of Lesbians.

99. In December 2018, the Plaintiff determined that the ever-increasing workload was out of control and that the Plaintiff needs to assess the division workload.

100.     The Plaintiff does a workforce analysis consisting of an excel spread sheet which illustrates an analysis of workload by person and task.

101.     The Plaintiff also generated backup information as to all the tasks and what they require.  The Plaintiff waited for her Branch chiefs to be back to work to get their input.  The Plaintiff knew that no other Division Manager has had to do such a detailed and specific analysis when asking for resources, but then again none of her peers had such a workload.

102.   The Plaintiff submitted the request to both Director Yak and the Deputy Figueroa on January 30, after the shutdown ended.   The Plaintiff requested 6 additional workers.

103.   In early February 2019, the Plaintiff meets with the Deputy Director Figueroa.  He never mentions the Plaintiff's request for resources.  Deputy Figueroa asks the Plaintiff about "stepping aside" to allow other folks to do her job, while she mentors them.

104.   On 19 February 2019, both Deputy Figueroa and Director Yak finally called the Plaintiff to a meeting to discuss her resources request from January 2019.  In the meeting, they push the Plaintiff to answer how she can immediately alleviate the pressure for herself.

105.   In retrospect, they were again asking Plaintiff to "step aside" which would have an immediate effect.  The Plaintiff said "provide me the resources".  They say, "that won't do it quickly enough".  They discussed the Plaintiff's health.

106.   The Plaintiff left the meeting with yet another task to accomplish before Defendants would address the request.  They did not provide even one requested resource.

107.   Deputy Figueroa sent the Plaintiff an inaccurate "recap" on February 20, 2019 of the February 19, 2019 meeting where he misrepresented the facts.  The Plaintiff is unable to respond right away because she was busy with the REDAC season and the core work of the Division.

108.   The Plaintiff didn't realize that this is a technique Deputy Figueroa would use on her again and again in the coming months. The technique is to inaccurately

restate the facts or a conversation trying to establish an incorrect record that meets his agenda.  The Plaintiff corrected the facts on March 4th, 2019 via email and provided a status of the task the Directors gave her before they would provide even one resource.

109.     All this time, the Plaintiff's managerial request for additional resources was not addressed, but other peer Division managers did receive their requested resources.  The Plaintiff continued to advocate for her employees who were overwhelmed and unable to keep up with the influx of work.  The Plaintiff had never been in a situation where high-level managers were unwilling to help the organization when they knew resources were needed.

110.     On February 27th, 2019, in a meeting with a couple of ANG-E4 staff members on Landscapes, Director Yak displayed distain for her own leadership and for fair dealing.  There was a meeting with the REDAC chair during the shutdown, because he was in town.

111.     In that meeting, Director Yak provided him a copy of a draft of the internal Landscape spreadsheet with research drivers and a designation of the lead, watch, participate analysis on it.  Steve Bradford, chief scientist for NextGen, told her she could not provide this analysis to the REDAC because it reflected a "FAA position".  The Plaintiff said to Director Yak, "but you already provided it to him." Director Yak responded, "I don't care".

112.     On March 19, 2019, the Plaintiff received another text from Deputy Figueroa with a sexually offensive and scary video.

113.     After the March 2019 REB meeting, Director Yak stayed behind and tasked the Plaintiff's employees and contractors with additional work in the Plaintiff's absence.  The Plaintiff's staff later complained about the tasks and that they had no choice but to agree to do what Director Yak asked, because after all, she is the Director.

114.     Had the Plaintiff been there, she would likely have at least informed Director Yak of the impact of those tasks to their other work.

115.     On March 27, 2019, the Plaintiff had a HGI meeting with Deputy Figueroa in his office in L'Enfant Plaza, Washington, DC.  His office was located in a deserted office suite because Ted Mercer's organization left L'Enfant plaza for another office building and the space had not been filled.

116.     Had the Plaintiff known what would transpire she would never have met in such an isolated place.  In this meeting, the Plaintiff explained that she needed to take some time off due to her declining health.  Deputy Figueroa got upset and said "its not that bad, maybe you will reconsider when I tell you you're getting resources!"  It had been 2 months since the Plaintiff submitted the detailed request for resources.

117.     Deputy Figueroa once again sends the Plaintiff a highly inaccurate account of that meeting.

118.     In the meeting during the discussion of resources, Deputy Figueroa presided with a one way dialog.  The Plaintiff asked which resources he is referring to when he demonstratively, loudly and pointing his finger at the Plaintiff and says "I am going to <u>terminate</u> this meeting if you don't stop interrupting me."

119.     The Plaintiff became frightened and immediately felt unsafe.  The Plaintiff said, "I can't do this anymore" and "I really appreciate you providing the resources".

120.     After Deputy Figueroa finishes his statements, the Plaintiff says, "I know you have another meeting to go to".  The Plaintiff says "I think I understand" and she slowly backed out of the room and left.

121.     The Plaintiff was physically shaken and scared by the intensity of bullying and hostility she had just experienced.  The Plaintiff had never experienced a meeting with a supervisor like this one.

122.      The Plaintiff went to CVS downstairs to get a bottle of water and try to calm down.  While in the CVS, the Plaintiff received a call and a text from Deputy Figueroa.

123.      The Plaintiff called him back and the hammering continued when  Deputy Figueroa wanted her to get the REDAC information that he had been asking Chinita Roundtree-Coleman for.  Chinita and the Plaintiff were both in DC for the NAS Operations REDAC sub-committee meeting in the adjacent building.

124.     The Plaintiff was very upset, and intimidated, bullied and threatened while doing her job.  The Plaintiff then proceeded to the REDAC meeting to speak with Chinita.  The Plaintiff explained to Chinita generally what had transpired between Deputy Figueroa and the Plaintiff and asked Chinita for the information he requested.

125.     In his "recap" of our conversation Deputy Figueroa got numerous facts wrong, again.  He said he could not recall a single instance when he had not

responded affirmatively to Plaintiff's requests, which is a lie, since he did not respond affirmatively on 19 February 2019. Most importantly, he mischaracterized the Plaintiff's demeanor and her attempts to get the facts straight during the HGI meeting in his DC office.

126.     He then referred the Plaintiff to the Employee Assistance Program (EAP), not recognizing his behavior at all. This is just another example of Deputy Figueroa producing an inaccurate record of events and facts to set his narrative, trying to obsfucate the truth.

127.     The Plaintiff now knew she has to correct the record being seeded by him, again. The Plaintiff believes Deputy Figueroa is tried to paint her as incompetent and insubordinate. The Plaintiff has over 20 years of management experience and recognizes this as a strategy being used to discredit her and harass her to drive her out of the organization.

128.     The Plaintiff remained in a heightened state of response, upset by the events of the week with Deputy Figueroa and was losing sleep. She didn't feel safe at work and kept trying to process all that happened, making notes and trying to write a response.

129.     The Plaintiff did send a response on 2 April 2019 setting the record straight and at the end of the email thanked Deputy Figueroa for the resources he finally allowed. The Plaintiff was trying do what is best for her employees and ultimately his organization.

130.     Unfortunately, after the meeting with Deputy Figueroa more troubling events occurred. When flying home on Thursday, March 28, 2019 on the FAA

shuttle from DC to NJ Flight #2 the Plaintiff saw Tiffany Smith.  The Plaintiff told Ms. Smith that Deputy Figueroa and she had a difficult meeting and that she was upset.

131.　　Ms. Smith said she was friends with Deputy Figueroa and that she too had had challenges with him in the past, but that they were friends, and they were going to "catch up" on the plane.  Ms. Smith and Deputy Figueroa sat next to each other one row in front and across the aisle from the Plaintiff on the plane.  This was unnerving, so the Plaintiff put her ear buds in to listen to music.  She did not have her reading glasses on.

132.　　The Deputy Figueroa stretched across the aisle and leaned back to show the Plaintiff a picture on his cell phone.  Because his phone was small it was difficult to see without her glasses.  All that she could see was a naked lady sitting on someone's lap.　Deputy Figueroa pushed it towards the Plaintiff.

133.　　The Plaintiff didn't understand why he was showing her the picture.  She squinted and what she saw was inappropriate and disgusting to her.  She asked what he was trying to show her.

134.　　He said, "do you like cologne?"  The Plaintiff said "what"?  Deputy Figueroa pushed the picture on his phone to me and said, "collusion cologne".  The Plaintiff took the phone, squinted and saw the full picture and promptly gave his phone back.

135.　　The picture was of Donald Trump's face on a naked woman's body sitting on Vladimir Putin's' lap with a caption "collusion cologne".  The Plaintiff was

stunned.  The sexual/homophobic sexual nature of the content was clear and abusive.

136.     Deputy Figueroa communicated degrading, sexually explicit filth to the Plaintiff who had no way to escape his behavior.  This stunning series of events made the Plaintiff want nothing else, but to escape from the abusive situation she was experiencing from the executive leadership she reported to.

137.     After that episode on the plane the Plaintiff saw Deputy Figueroa speaking to Tiffany about a document that the Plaintiff could see Ken Diaz had written.  It was an Executive summary of the NARP, written at the Director's request for Pam Whitely.

138.     It had a few mistakes in it.  The Plaintiff knew it was this document because it had a very specific and uncommon format.  Because they were talking about it and the Plaintiff knew about the mistakes, the Plaintiff assumed he was explaining his issues with her division to Tiffany Smith in an effort to explain why he was giving the plaintiff a hard time.

139.     The Plaintiff saw Ms. Smith say "really?" as Deputy Figueroa was speaking about the document. Why was Deputy Figueroa discussing the Plaintiff's division's work with a subordinate who was not even employed by ANG?  This behavior is inappropriate and wrong and intended to diminish the Plaintiff, tarnish her reputation and subvert her credibility.

140.     The Plaintiff was offended by Deputy Figueroa's behavior. This occurred mid-flight the day after a difficult meeting.

141.     The Plaintiff was frightened and continued to be frightened by Deputy Figueroa's actions towards a senior leader in his organization.

142.     Upon arrival at the Technical Center that same morning the Plaintiff knew she had to get to Janet Kinsell's retirement party. The Plaintiff entered the Directors suite and believed there was no SMT meeting scheduled that day, so she entered the Director's work room where to her astonishment, she was greeted with the entire SMT in a meeting without her, including Deputy Figueroa, who was just on the plane with her.

143.     The Plaintiff was startled, expecting to find the party.  They all looked at the Plaintiff in shock to see her and Paula Nouragas said, oh, "you don't need to be here".  They all insisted the Plaintiff not stay for the meeting.

144.     The Plaintiff clearly surprised all of them.  It was like the Plaintiff was the last person they expected to see coming through the door, and they all appeared physically shaken to see her.

145.     The Plaintiff continually had to remind Director Yak and her staff to keep her informed of the conversations and emails that they were having with her staff, because they continued to go around her, and exclude her, thereby undermining her authority and ability to manage her division.

146.     The Plaintiff was so profoundly disturbed by her experiences, especially Deputy Figueroa's inaccurate records of the conversations and facts that she was afraid to be alone with either Director Yak or Deputy Figueroa.  The Plaintiff had a scheduled HGI with Director Yakon April 4th.

147.     Accordingly, the Plaintiff asked Director Yak on April 2nd, 2019 if she could record the conversation during the planned meeting, so the Plaintiff could have an accurate and un-refutable record of their discussion.  Not surprisingly, Director Yak canceled the planned meeting and denied the Plaintiff's request to record the conversation.

148.     On April 4th 2019, Plaintiff finally had time to complete and send Director Yak and Deputy Figueroa the information they requested in January, allegedly needing it to decide whether to give the Plaintiff the resources requested or not to. Strangely, they had already provided some of the resources requested without this.

149.     The Plaintiff, desperate for relief, requested leave for work related stress on April 5th, 2019 and received approval.  The Plaintiff gave Directors Yak and Figueroa a month to determine who should act in the position, during her absence.

150.     On April 19, 2019, the Plaintiff had a midterm performance review with Deputy Figueroa via the phone.  Deputy Figueroa did not provide any review of the Plaintiff's performance until she asked him for it at the end of the conversation. Deputy Figueroa said he will approve the requested leave.

151.     Deputy Figueroa reviewed the division work and personnel in detail with the Plaintiff.  Deputy Figueroa says he will provide a "BS story" to his leadership on the NARP.  He curses a bit.

152.     When the Plaintiff asked for her appraisal, he said he would write a one-liner for Plaintiff.

153.     Deputy Figueroa told the Plaintiff that he was replacing her with Jim Connett, one of her peers.  Deputy Figueroa said that Jim has "great leadership skills" and "no preconceived notions" about how to manage R&D".

154.      The Plaintiff was out on work related sick leave for 3 months. The Plaintiff heard while she is out on leave, that Deputy Figueroa was saying that she will not return to work.

155.     The Plaintiff did return to work when she said she would on 1 August 2019. Last year, she received a $2500.00 summer performance award, before receiving the inappropriate text messages from Deputy Figueroa.

156.     It is common to withhold awards for only employees who are completely incompetent and do no work.  Even marginal employees usually get something. The Plaintiff got nothing as punishment for not engaging with his behavior and for taking sick leave.

157.     On May 3, 2019 just before the Plaintiff went out on sick leave, Director Yak joins a meeting in progress with legal and some of the Plaintiff's staff.  The meeting is about HR 4174 "Foundations for Evidence Based Policy Making Act of 2018".

158.     The Plaintiff was asking for legal guidance and assistance to understand how the FAA is meeting the Act.  Again, the Plaintiff received no legal advice.  The Director was unconcerned.  The Plaintiff asked what the FAA was doing to comply with the law, but she has never received an answer.

159.     To this date Plaintiff has no idea how the FAA might be meeting the law, if at all.

160.     The Plaintiff returned to the office August 1, 2019.  Ken Diaz had also  left the division due to health issues that are returning due to excessive stress.  He is a critical asset and a Branch Manager.

161.     Once more, the Plaintiff found herself short of resources.  Director Yak's office continued to maintain a hostile work environment and operated around the Plaintiff and her management team.

162.     On August 21st, 2019 The Plaintiff was heading to a meeting in the Directors work room in her suite of offices.  While in the suite and just outside the work room, in the presence of Donna Amon and one or two others Jaime Figueroa called to me from his office to say you look good, "You look just like your younger sister."

163.     Plaintiff's sister died tragically. Plaintiff could not rationalize why he would say such a discriminatory and hurtful thing.

164.     During REDAC season, the Plaintiff typically missed some if not all, SMT meetings, due to the extra burden of time and travel on top of an already packed schedule.  Deputy Figueroa mentioned this in the HGI in August.  Director Yak suggested that the Plaintiff is not coming to the meetings on purpose.

165.     Out of the blue, Director Yak levied a "new rule" on the Plaintiff, that the Plaintiff must provide an explanation of an absence from the SMT meetings prior to the meeting.  The Plaintiff had pressing work to complete, not to mention catching up on the 3 months she was out and was being singled out, harassed and discriminated against.

166.     The Plaintiff, after suffering through the hostile work environment, could no longer tolerate the hostile and discriminatory working environment and was constructively discharged into retirement.

## COUNT I

167.     The allegations contained in each paragraph of all preceding Counts are repeated and incorporated herein as though set forth at length.

168.     The New Jersey Law Against Discrimination prohibits employment discrimination based upon sex, sexual orientation or age. N.J.S.A. 10:5-12.

169.     Sexual Harassment is a form of sex discrimination that violates the New Jersey Law Against Discrimination.

170.     Defendants sexually harassed the Plaintiff Maureen Molz, because she is a fifty eight year old female and is legally married to a woman.

171.     Discriminated on the basis of sex is a violation of the New Jersey Law Against Discrimination. [See Erickson v. Marsh and McLennan Co. , 117 N. J. 539, 555-56 (1990) suggesting that sexual harassment that creates hostile environment is prohibited under the Law Against Discrimination.]

172.     Defendants and/or John Doe 1-10 created a hostile work environment by harassing the Plaintiff Maureen Molz because of her age, sex and/or sexual orientation to the point that she was constructively discharged into retirement.

173.     The acts of Defendants Jaime Figueroa, Shelley Yak and/or John Doe 1-10, as imputed to Defendant Federal Aviation Administration, occurred because of Plaintiff's age, sex, and/or sexual orientation.

174.     The acts are severe or pervasive enough to make a reasonable woman believe that the conditions of employment are altered, and the conditions of employment are altered and the working is hostile and abusive.

175.     Defendant Federal Aviation Administration is liable for the acts or omissions of its employees Jaime Figueroa, Shelley Yak, and/or John Doe 1-10.

176.     It is further alleged that Defendant Federal Aviation Administration contributed to the harm through its negligence, intent or apparent authorization of the harassing conduct.

177.     Defendant Federal Aviation Administration negligently or recklessly failed to have an explicit policy that bans sexual harassment and that provides an effective procedure for the prompt investigation and remediation of such claims.

178.     As a direct and proximate result of the acts/omissions of Defendants, Plaintiff Maureen Molz has suffered damages.

WHEREFORE, Plaintiff Maureen Molz demands judgment against the Defendants Federal Aviation Administration, Jaime Figueroa, Shelley Yak and/or John Does 1-10 individually, jointly & severally for:

        a.     Compensatory damages

        b.     Attorney's fees; and

        d.     Interest; and

        e.     Cost of suit; and

                MARK J. MOLZ, ESQUIRE
                ATTORNEY for Plaintiff(s)

Dated: November 16, 2021     By:   *Mark J. Molz, Esq. /s/*
                          Mark J. Molz, Esquire

## JURY DEMAND

Pursuant to the Federal Rules of Civil Procedure Plaintiff(s) hereby demand a trial by Jury for all issues so triable.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Federal Rules of Civil Procedure, Mark J. Molz, Esquire is hereby designated as Trial Counsel for Plaintiff(s) in connection with this litigation.

## NOTICE OF PER DIEM TIME-UNIT CLOSING ARGUMENT

PLEASE TAKE NOTICE that Plaintiff(s) will use per diem argument during closing argument at Trial and suggest to Jury that unliquidated damages be calculated on a time-unit basis without reference to a specific sum, pursuant to New Jersey Court Rule 1:7-1(b) and case law.  Proper explanatory instructions to jury shall be requested in accordance with the Rule.

## CERTIFICATION OF OTHER ACTIONS AND PARTIES

Pursuant to Federal Rules of Civil Procedure, the undersigned hereby certifies that the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding. No other action or arbitration proceeding is contemplated, other than, if applicable to this case, UM/UIM arbitration. The undersigned does not know of the names of any other parties who should be joined in the action or who are subject to joinder.

MARK J. MOLZ, ESQUIRE
ATTORNEY for Plaintiff(s)

Dated: November 16, 2021          By:     *Mark J. Molz, Esq. /s/*
                                          Mark J. Molz, Esquire